*********** *Page 2 
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments before the Full Commission. The appealing parties have shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission MODIFIES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff-employee and defendant-employers as follows:
 • Power Plant Maintenance Company (PPM) for parts of 1985, 1987, 1993, 1994 and 1995
 • Moree's Power Plant Maintenance (Moree's PPM) for parts of 1992.
 • Industrial Maintenance Overflow Corporation (IMOCO), 6/1/92 to 4/93; 6/21/93 to 8/12/93; 8/23/93 to 8/26/93; 9/13/93 to 9/23/93; 11/10/93 to 11/14/93; 11/22/93 to 11/27/93;3/28/94 to 8/11/94; 2/20/95 to 5/17/95 and 1/25/99 to 3/11/99.
3. According to the records of the North Carolina Industrial Commission, workers' compensation coverage for employer-defendants was provided as follows:
 • PPM: *Page 3 
 USFG/St. Paul Fire Marine from 11/1/84 to 11/1/85 Lumbermen's Insurance/Broadspire from 11/6/85 to 11/6/87 Standard Fire/St. Paul Travelers from 8/25/86 to 2/28/87 and Reliance Insurance from 10/1/91 to 10/1/95.
 • Moree's PPM
 Reliance Insurance from 10/1/91 to 10/1/93.
 (NCIGA is defending claim for insolvent carrier Reliance)
 • IMOCO
 Key Risk Insurance from 7/1/91 to 7/1/96
 PMA Insurance from 7/1/97 to 7/1/99
4. Issues for resolution in this matter are as follows:
 A. Whether plaintiff contracted asbestosis;
 B. If so, then when and with which employer was plaintiff's last injurious exposure to asbestos;
 C. If plaintiff has asbestosis, is there a causal relationship between the asbestosis and sleep apnea or cor pulmonale;
 D. Determination of average weekly wage;
 E. Whether plaintiff is disabled by asbestosis;
 F. Whether plaintiff is entitled to compensation under N.C. Gen. Stat. § 97-31 (24) for damage to any organ from asbestosis;
 G. Whether plaintiff is entitled to attorney's fee pursuant to N.C. Gen. Stat. § 97-88.1;
 H. Whether any penalties should be imposed on defendants; *Page 4 
 I. Whether the claim against Key Risk should be dismissed;
 J. Whether Key Risk is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
5. The following exhibits have been entered into the record of this matter:
 A. Pre-trial agreement as Stipulated Exhibit 1;
 B. Industrial Commission forms as Stipulated Exhibit 2;
 C. Social Security earnings statement as Stipulated Exhibit 3;
 D. Social Security Disability records as Stipulated Exhibit 4;
 E. Medical records as Stipulated Exhibit 5;
 F. Discovery responses as Stipulated Exhibit 6;
 G. IMOCO personnel file for plaintiff as Stipulated Exhibit 7;
 H. Kimberly Clark abatement documents as Stipulated Exhibit 8;
 I. Champion Records as Stipulated Exhibit 9;
 J. Photographs as Stipulated Exhibit 10;
 K. Neo Corporation records as defendants' Exhibit a.
 ***********
Based upon the competent and evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on June 13, 1953, and he was 53 years old as of the date of the hearing before the Deputy Commissioner. Plaintiff resides in Bakersville, North Carolina.
2. Plaintiff had a 32-year smoking history. He averaged smoking from one-half pack of cigarettes per day to two or three packs of cigarettes per day. *Page 5 
3. Plaintiff worked for High Valley Construction from 1976 to 1979 and from 1982 to 1987. He told Dr. James McCarrick in March, 2001, he had been covered in asbestos and was positive he had inhaled asbestos in his twenties.
4. Beginning in 1978 and for more than 20 years thereafter, plaintiff was a millwright. As a millwright, he did maintenance at power plants, paper mills, and textile mills in North Carolina, South Carolina and the eastern United States. Plaintiff worked on all kinds of machinery, including paper machines and turbine generators.
5. Plaintiff's work usually occurred during a shutdown when the plant would shut down various machines. After the shutdown, plaintiff went to the plant and did maintenance and repair services to the equipment.
6. Demolition was a big part of plaintiff's job. Plaintiff tore out machinery and scrapped it. He was required to tear all the electrical connections loose, as well as all the pipe work. Plaintiff then picked up the machinery piece by piece and disposed of it.
7. Plaintiff typically worked with piping during demolition. He testified that there was a significant amount of piping around paper machines and textile machines. As a millwright, he was in contact with piping on virtually a daily basis.
8. About 80 percent of the piping plaintiff worked around was insulated. It was common for him to come in contact with and disturb the insulation. When doing maintenance or demolition, plaintiff removed the insulation to get to the piping or machinery. He removed the insulation on the machinery with his hands, as well as with a hammer and wire cutters. The insulation fell onto the floor around him. Plaintiff cleaned up the insulation by picking up the pieces and dry sweeping the debris. He used air hoses to blow off insulation dust and lines *Page 6 
where he was removing insulation. This entire process was very dusty and was a common practice throughout his years as a millwright.
9. Plaintiff testified that most of this insulation contained asbestos and that asbestos was used almost exclusively for many years. Plaintiff's supervisors told him that he was working with asbestos.
10. Plaintiff worked for Power Plant Maintenance (PPM) as a millwright for parts of 1985, 1987, 1993, 1994, and 1995. For PPM, he worked at paper mills and power plants including CPL at their Skyland facility and at the Champion Paper facility. He testified that when he worked for PPM, he worked around insulated pipes at various facilities every day and disturbed insulation on a regular basis several times a week.
11. When plaintiff was working for PPM, he worked around asbestos insulation. The insulation was labeled as asbestos. He said that the asbestos was "everywhere you looked" in the plants while working for PPM. The asbestos was used for pipe insulation, machine insulation, and turbine installation. While working for PPM, plaintiff tore asbestos off pipes and machinery.
12. One of plaintiff's main jobs at PPM was millwright work at the Champion Paper plant. He testified that there was a lot of piping in that plant. At least 75% of the time, plaintiff was in areas of the Champion Plant where insulated pipe was located. At Champion, most of the pipes were insulated and the insulation was in bad shape. The insulation was damaged and deteriorated, hanging from the pipes and exposed to the plant environment. Plaintiff stated that working with insulation at Champion was very dusty. Plaintiff cleaned up insulation, which contained asbestos, at Champion.
13. A memorandum from Champion Paper indicated that all employees handling asbestos insulation at the plant were to be provided with protective equipment; however, plaintiff *Page 7 
never received such equipment. During demolition work at Champion, the areas being demolished were not wet down or sectioned off.
14. While working for PPM, plaintiff worked concurrently for Industrial Maintenance Overflow (IMOCO) as a millwright for various periods from 1992 through 1995. Plaintiff also worked at the Champion plant while he was employed by IMOCO in the mid-90's, and performed similar work in the same areas as when he worked at the Champion plant for PPM.
15. IMOCO did many demolition jobs at the Kimberly Clark plant where plaintiff also worked. During the job at Kimberly Clark in 1994, plaintiff's crew was doing demolition and removing insulated pipes and machinery. Plaintiff testified that at this job, his crew tore out everything, ceiling to floor, including insulated piping and insulated machinery. The crew was around insulated piping all the time. When they were doing demolition, the work area was very dusty from the insulation dust. Plaintiff spent at least half of each day working with insulated piping. In April 1994 employees from Neo Corporation came into the Kimberly Clark facility and set up containment areas and started removing asbestos in plaintiff's immediate area. The abatement company was working directly beside and within four feet of plaintiff's crew and the dust came into their area.
16. Jones Hughes was the foreman on plaintiff's crew at IMOCO's demolition project at the Kimberly Clark site. Mr. Hughes stated that the crew worked between May 1992 and February 1993. He also testified that the crew worked with asbestos during the demolition and that his crew did several weeks of demolition work before the Neo employees initiated the asbestos abatement work. Because Mr. Hughes' recollection of the dates that his crew, including plaintiff, worked at the Kimberly Clark facility is inconsistent with the dates in the Neo *Page 8 
abatement records, the Commission gives little weight to the dates of employment provided by Mr. Hughes.
17. Alvin Ollis worked at various job sites with plaintiff and confirmed that the environments where they worked was very dusty from the insulation they removed from pipes.
18. Scott Hensley worked as a piping supervisor for IMOCO and testified that insulation at the Kimberly Clark site was in better shape than most plants and that he believed the Kimberly Clark plant was safe. Rodney Pressley, one of the owners of IMOCO, also testified that the Kimberly Clark facility was safe.
19. Plaintiff testified, and the Full Commission finds, that his last exposure to asbestos occurred during his employment with IMOCO from March 28, 1994 through August 11, 1994 when he last did demolition at Kimberly Clark. During several weeks of this period, the Neo Corporation completed an abatement project at the Kimberly Clark facility. Plaintiff's job lasted six months, with half that time involving demolition. Plaintiff worked for IMOCO again in 1999 but did only new installations and was not exposed to asbestos. His other jobs with PPM and IMOCO after 1994 were for less than 30 days duration.
20. From 1996 to 2001, plaintiff worked in the mining industry, mostly for Unimin Corporation in Spruce Pine, North Carolina, doing millwright and maintenance work and driving a truck. Unimin Corporation operated a natural quartz mine and mined silica sand. Plaintiff remembers breathing in quartz and silica sand while performing this job.
21. Plaintiff was admitted to Johnson City Medical Center with loss of consciousness and substernal chest pain on June 21, 2000. Plaintiff underwent left heart catheterization, coronary arteriography and angioplasty. Plaintiff suffered an acute inferolateral myocardial *Page 9 
infarction and was diagnosed with multivessel coronary artery disease. He was discharged from the hospital on June 25, 2000. Plaintiff had another heart attack in September 2000.
22. In January 2001, when plaintiff was working for Unimin, he began having severe breathing problems. He became short of breath and had a dizzy spell and blacked out. When he last worked, plaintiff was a truck driver and Unimin would not permit him to continue to drive because of his blackouts. Unimin thereafter placed plaintiff on short term disability. Plaintiff has not worked since January 2001 and is on Social Security Disability.
23. From 1999 to 2004, plaintiff was treated by his family physician, Dr. Arch Woodard. Dr. Woodard treated plaintiff for coronary artery disease, hypertension, and lung disease. Dr. Woodard did not make the initial diagnosis of asbestosis, but he agreed with plaintiff's subsequent diagnosis.
24. Upon referral by Dr. Woodard, on March 1, 2001, plaintiff was seen by Dr. James McCarrick with Asheville Pulmonary and Critical Care Associates.
25. On March 13, 2001, a high resolution chest CT revealed that plaintiff's lungs had multiple areas of pleural thickening bilaterally, greater on right and a subpleural calcification appreciated, with small areas of fibrotic changes.
26. On March 15, 2001, Dr. McCarrick noted that plaintiff appeared to have restrictive lung disease secondary to his pleural fibrotic changes, perhaps secondary to asbestos.
27. On April 16, 2001, plaintiff was seen by Dr. Yuh-Chin Huang. Dr. Huang is a pulmonary critical care physician at Duke University Medical Center. He is board certified in internal medicine, pulmonary medicine and critical care medicine. Dr. Huang confirmed the diagnosis of asbestosis, with significant pleural plaquing and parenchymal lung disease. Plaintiff also has chronic obstructive pulmonary disease (COPD) as the result of his cigarette smoking. *Page 10 
28. In his deposition, Dr. Woodard testified that plaintiff was suffering from cor pulmonale, which is right-sided heart failure, caused by lung disease. Dr. Woodard determined that the cor pulmonale in plaintiff's case was not related to his heart attack or other coronary problems, but he could not testify to a reasonable degree of medical certainty that the condition was caused by asbestosis. Dr. Woodard testified that plaintiff's smoking-derived lung conditions could have been the causative factor in the development of his cor pulmonale. Dr. Woodard also opined that plaintiff's heart condition as well as his sleep apnea are unrelated to his asbestosis.
29. Dr. Woodard opined that plaintiff was unable to return to work as a millwright due to the exposure to industrial dust. Dr. Woodard opined that plaintiff was unemployable based on several conditions, including his poor lung function. Although Dr. Woodard testified *Page 11 
plaintiff could have performed sedentary work at least during 2001 through 2004, he also stated that plaintiff could not do any lifting, heavy manual labor, exertion or physical activities. Dr. Woodard stated that plaintiff's physical limitations are related to his pulmonary and cardiac conditions and that he was unable to distinguish what percentage of disability each condition contributed. Dr. Woodard also opined that plaintiff's exposure to silica and quartz dust could have significantly contributed to plaintiff's lung condition.
30. In his deposition, Dr. McCarrick stated that plaintiff has asbestosis and that the asbestosis is contributing to plaintiff's overall breathing problems. However, Dr. McCarrick testified, "I think the degree of lung disease seen on his high resolution CT scan was relatively scant, and that the probability that he had significant underlying asbestosis was relatively small." Plaintiff has obstructive lung disease, which Dr. McCarrick opined was not related to his asbestos exposure. Rather, Dr. McCarrick opined that the primary cause of plaintiff's obstructive lung disease is tobacco inhalation. Dr. McCarrick was unable to state whether plaintiff could have performed sedentary work. Dr. McCarrick believed that plaintiff could have continued driving a truck for Unimin Corporation, as long as he was not obligated to do any loading or unloading and was not in a dusty environment. Dr. McCarrick did not believe that plaintiff's sleep apnea was related to the asbestosis.
31. The parties also deposed Dr. Huang. Dr. Huang opined that it was not wise for plaintiff to continue working in dusty conditions. He set forth that plaintiff's inability to work as he had for thirty years was due to lung function and not any heart problems. Dr. Huang testified that plaintiff has an enlarged heart that could be caused by interstitial lung disease. Patients with significant degrees of underlying pulmonary fibrosis can end up with cor pulmonale, which is an enlargement in the right heart due to the blood's difficulty in pumping through scarred lung tissue. Dr. Huang testified that while quartz and silica do not cause asbestosis, these materials could "possibly" make the lung defect worse. Any industrial exposure, or exposure to smoking, could make plaintiff's existing lung condition worse.
32. Plaintiff was seen by Dr. Ahmed Khan for his heart problems. Plaintiff has congestive heart failure and ventricular tachycardia. Dr. Khan also noted that plaintiff has asbestos related lung disease and he found that the pulmonary problems were "irreversible."
33. Plaintiff presented to Dr. Stephen D. Proctor on January 25, 2006 for a pulmonary function test (PFT). Dr. Proctor is board certified in internal medicine, critical care and pulmonary medicine. He testified that it is difficult to tell from a PFT alone whether plaintiff has asbestosis. Dr. Proctor could not distinguish between asbestosis and silicosis simply by looking at a PFT. Plaintiff's results were fairly consistent with someone who has an extensive smoking history. *Page 12 
34. Dr. Proctor diagnosed plaintiff with both a severe obstructive and a moderately severe restrictive lung impairment. Plaintiff has a Class III restrictive breathing impairment. According to Dr. Proctor plaintiff's breathing impairment renders him disabled from any employment. Dr. Proctor also testified that plaintiff's exposure to silica dust and quartz could be a potential causal factor in the restrictive lung condition.
35. On or about November 12, 2002, plaintiff filed a Form 18B with the North Carolina Industrial Commission asserting he had sustained an occupational disease caused by exposure to asbestos. The Form 18B alleged plaintiff was diagnosed with asbestosis on April 16, 2001.
36. Plaintiff's claim for benefits was denied by all defendants.
37. The competent evidence of record establishes that plaintiff worked with insulation which contained asbestos at the Champion and Kimberly Clark facilities while employed by IMOCO and PPM.
38. Plaintiff contracted asbestosis as a result of his work as a millwright.
39. The last time that plaintiff was exposed for 30 days or more in 7 consecutive months was in 1994 while working for IMOCO at the Kimberly Clark facility. The insurer on the risk for IMOCO from 1991 to 1996 was Key Risk Insurance. Therefore, Key Risk Insurance is the responsible carrier.
40. The evidence fails to show that plaintiff's exposure, if any, to silica and/or quartz dust in his employment in the mining industry constituted a last injurious exposure to the hazards of asbestos, pursuant to N.C. Gen. Stat. § 97-57. *Page 13 
41. Defendants did not file a Form 22. Therefore, the Full Commission finds that plaintiff's compensation rate is $620.00 per week, which was the maximum compensation rate in 2001.
42. The Full Commission finds that the greater weight of the medical evidence in the record does not establish that plaintiff's cor pulmonale or sleep apnea were caused by asbestosis.
43. As the result of plaintiff's contraction of asbestosis, he is unable to return to work as a millwright. Although there is some medical evidence that plaintiff is capable of sedentary employment, the Full Commission finds that it would be futile for plaintiff to look for work because of his age, his limited education, his work experience primarily as a millwright, and his multiple health conditions.
44. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted asbestosis as a result of his employment as a millwright. This is an occupational disease under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(24).
2. Plaintiff's last injurious exposure to the hazards of asbestos in excess of 30 working days, or parts thereof, within seven consecutive months occurred during his *Page 14 
employment with IMOCO during 1994. Therefore, IMOCO is the responsible employer. N.C. Gen. Stat. § 97-57.
3. Key Risk is the responsible carrier and is, therefore, liable for payment of compensation due plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
4. Plaintiff's weekly compensation rate is set at $620.00 per week. N.C. Gen. Stat. § 97-2(5).
5. To prove disability under the Act, an injured employee must establish that he is incapable of earning the same wages he earned at the time of contracting the disease or receiving the injury, at his same job or any other employment. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may prove he is incapable after injury of earning the same wages he earned before injury in any other employment in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but has, after a reasonable effort been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, or lack of education, to seek other employment; (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowe's ProductionDistribution, 108 N.C. App. 762, 425 S.E. 2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms, Inc., supra. *Page 15 
6. In this case, the physicians have released plaintiff to return to sedentary work. However, even though plaintiff may be capable of some work, he has shown that after January 2001, it was futile for him to seek employment because of his limited education, work experience only as a millwright, his inability to perform even light duty work as a truck driver, and his complicated health conditions. Demery v. PerdueFarms, Inc., supra.
7. Defendant has not shown that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms, Inc., supra.
8. As the result of the contraction of the occupational disease of asbestosis, plaintiff is disabled from any employment and is entitled to have defendants IMOCO and Key Risk pay his total disability compensation at the rate of $620.00 per week beginning January 2001 and continuing until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
9. Plaintiff is entitled to medical treatment incurred or to be incurred related to his asbestosis as is reasonable and necessary pursuant to N.C. Gen. Stat. §§ 97-25 and 97-25.1.
10. Defendants did not defend this action without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Commission enters the following: *Page 16 
 AWARD
1. Subject to the attorney's fee awarded below, defendants IMOCO and Key Risk shall pay plaintiff total disability compensation at the rate of $620.00 per week from January 2001 and continuing until plaintiff returns to work or further Order of the Commission. Any accrued amounts shall be paid in a lump sum.
2. Plaintiff is entitled to all medical treatment resulting from his contraction of a compensable occupational disease to the extent that such treatment was designed to effect a cure, give relief or lessen the period of disability.
3. A reasonable attorney's fee in the amount of 25% of the compensation awarded plaintiff in Paragraph 1 above is approved and allowed for plaintiff's counsel. Of the accrued amount, 25% shall be paid directly to plaintiff's attorney. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendant Key Risk shall pay the costs of this action. Costs shall include expert witness fees of $400.00 to Dr. Cassanego, $500.00 to Dr. McCarrick, and $1,000.00 to Dr. Huang, to the extent these fees have not already been paid.
This the 3rd day of December, 2008.
 S/_______________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________________ DANNY LEE McDONALD COMMISSIONER *Page 1